**DISTRICT OF OREGON, ss: AFFIDAVIT OF KYLE BEAM**

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Kyle Beam, being duly sworn, do hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Task Force Officer (TFO) for the Federal Bureau of Investigation and have a special deputation to investigate and enforce violations of Title 21 of the United States Code, which includes controlled substances offenses. I am a Detective employed by the Multnomah County Sheriff's Office, assigned as an investigator with the Multnomah County Sheriff's Office (MCSO) Special Investigations Unit (SIU) – Dangerous Drug Team. I am a sworn police officer and have been since August 2019. I have conducted multiple investigations into drug trafficking offenses and weapons offenses. Through this training and experience, I have become familiar with the way drug traffickers operate to carry out their criminal activity.

2. I submit this affidavit in support of a criminal complaint and arrest warrants for **DAYAN JACIEL MENCIA-ARCHAGA (DOB: XX/XX/2004)** and **RONALD FABRICIO OCHOA-HERNANDEZ (DOB: 01/XX/2004)** for committing the felony offenses of:

a. Conspiracy to distribute and possess with intent to distribute fentanyl, a Schedule II controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; and,

b. Distribution of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C),

collectively referred to as the "Target Offenses." As set forth below, there is probable cause to believe, and I do believe, that **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD**

**FABRICIO OCHOA-HERNANDEZ** have committed the Target Offenses here within the District of Oregon.

**Use of Confidential Reliable Informant**

3. This investigation involves the use of a Confidential Reliable Informant (CRI) who during the month of June 2026 provided me with information about fentanyl traffickers operating within Multnomah County, Oregon. The CRI provided information to law enforcement in exchange for both monetary compensation and to avoid being criminally charged for state level drug crimes. Although the CRI is willing and available to testify in this investigation, based on my training and experience, I know that drug traffickers often use violence, threats, and intimidation against their perceived enemies, including against any cooperating witnesses and labels them as "rats, snitches, or informants." Accordingly, to help protect the CRI, I am purposefully omitting details that if known to the drug traffickers or the public at large would aid in the CRI's identification. I have reviewed CRI's criminal history and found that CRI has no felony convictions and/or any convictions for crimes of dishonesty. Information provided by the CRI has been corroborated through surveillance, controlled narcotics buy(s), and the review of the CRI’s cellular communication data. Based on the investigation to date, I believe the CRI's information has been sufficiently corroborated and is truthful and accurate.

///

///

///

**Statement of Probable Cause**

4. In June 2026, I interviewed the CRI who stated they'd purchased a quantity of fentanyl from a person they described as a Mexican or Honduran male, whom they knew by the name of "Mario." The CRI said they'd previously contacted Mario to purchase fentanyl. The CRI stated they communicated with Mario by texting/calling the cellular number "503-xxx-4837" (hereinafter "Previous Device"). The CRI stated during their previous communications with Mario, they would request an amount of fentanyl and Mario would arrange the delivery of fentanyl in exchange for cash. The CRI stated during a previous drug deal, Mario confirmed he would send a different male (a "Runner") to the buy location to deliver the fentanyl. The CRI stated they provided the unidentified male (potential runner) with an amount of cash in exchange for the fentanyl. The CRI stated they were then provided with an amount of fentanyl in exchange for that cash.

5. In June 2026, as a result of the above-mentioned information provided by the CRI, MCSO SIU conducted a controlled buy with "Mario." At the direction of law enforcement, the CRI contacted "Mario" on the Previous Device and requested to buy a quantity of fentanyl. "Mario" agreed to the deal and later that day a Hispanic male showed up in a vehicle and delivered fentanyl to the CRI in exchange for cash. The Hispanic male who showed up was identified as the registered owner of the vehicle he arrived in and he was not one of the named defendants in this affidavit.

6. Following the controlled buy we learned that in July 2026, the person known to the CRI as "Mario" had driven to Utah and was arrested by DEA. When he was arrested

"Mario" was found in possession of approximately 60,000 counterfeit pills suspected to be manufactured with fentanyl.

7. Within the past 30 days, I spoke with the CRI. The CRI advised me that they received a message from a new cell phone number and a person who was claiming to be the "new Mario." The CRI advised that "new Mario" claimed his new cellphone number was 503-xxx-1168 (hereinafter "**Target Number**"). The CRI stated they contacted the **Target Number** via text message inquiring if the holder of that device (the "new Mario") would be able deliver an amount of fentanyl. The CRI told me that "new Mario" messaged back stating that he was currently unable to deliver fentanyl, however he would let the CRI know when he was able to sell the CRI with fentanyl. I personally observed the messages between the CRI and **Target Number (**"new Mario"), which verified the CRI's statements.

8. Based on the above information, I applied for and was granted a search warrant authorizing the collection of geolocation data for the **Target Number,** being used by the "new Mario." This warrant was authorized by the Honorable Jolie A. Russo, United States Magistrate Judge, on July 30, 2026. *See* 3:26-mc-00765. Upon receipt of the geolocation data, I discovered that the **Target Number's** location data showed its current location was consistent with the prior locations for the Previous Device. For example, the current location data of the **Target Number** during the late-night hours nearly matches the prior location data where the Previous Device would be during late-night hours. Those similarities led me to believe that the holder of the **Target Number** ("new Mario") likely resided in the same location as the Previous Device (the former "Mario") during the night-time hours.

**First Distribution of Fentanyl by Defendants**

9. Within the last 30 days, I directed the CRI to contact "new Mario's" **Target Number** by call/text in an effort to purchase an amount of fentanyl. The CRI told me "new Mario" agreed to deliver fentanyl and they agreed on a specific location where the deal would take place. The CRI showed me the messages with "new Mario" which confirmed the conversation. Prior to the deal, I searched the CRI's person and CRI's vehicle for weapons, cash, and drugs. After determining the CRI was not in possession of these items, I then directed the CRI to proceed with the purchase of fentanyl, using MCSO SIU investigative funds we provided. I also equipped the CRI with a real time audio video monitoring device which would allow investigators to monitor the transaction.

10. I surveilled the CRI to the pre-determined buy location, which was within Multnomah County, in the District of Oregon. Investigators and I maintained constant visual of the CRI enroute to and at the pre-determined buy location. The CRI did not stop, pick up anything or anyone enroute or at the buy location. After a short time we observed two males drive up to the buy location and park next to the CRI in the roadway. I watched the CRI then enter the rear passenger door of the vehicle that just arrived, which I identified as a 2003 Toyota Camry, bearing Oregon License Plate "454NFH" (hereinafter "**Subject Vehicle**"). I listened to the CRI who asked to confirm the price of fentanyl with the two males. I heard the male(s) state the price. I then watched the CRI exit the vehicle moments later. The males occupying the **Subject Vehicle** then drove away from the location. Although we did not know their names at the time, through surveillance of the deal and then based upon on the subsequent arrests of both

people who had been in the **Subject Vehicle**, we now know that **DAYAN JACIEL MENCIA-ARCHAGA** was the driver and **RONALD FABRICIO OCHOA-HERNANDEZ** was the passenger in the **Subject Vehicle**.

11. After the controlled buy, I surveilled the CRI to a subsequent meeting location. The CRI did not stop, pick up anyone or anything enroute to the meet location. At the subsequent meeting location the CRI handed me an amount of fentanyl. At that time, the CRI's person was searched for weapons, cash, and other drugs, with none being found. During a debrief, the CRI told me they gave the male occupying the front passenger seat of the **Subject Vehicle** the MCSO SIU investigative funds I provided, then the CRI received the fentanyl from that same individual in return. The CRI provided a physical description of the driver and passenger. The CRI said that the driver of the **Subject Vehicle** looked like a younger Hispanic male, possibly in his teens (later identified by investigators as **DAYAN JACIEL MENCIA-ARCHAGA)**. The CRI advised the passenger of the **Subject Vehicle** appeared to be a 30–40-year-old Hispanic male (later identified by investigators as **RONALD FABRICIO OCHOA-HERNANDEZ)**. The CRI's statements matched the physical description MCSO SIU investigators observed during the controlled buy. The CRI stated based on their opinion, it appeared the passenger was training the driver to deliver fentanyl.

10. I later transported the fentanyl to the SIU office. I weighed and tested an amount of the fentanyl with a Mobile Detect test and saw the test indicated positive for fentanyl, a Schedule II controlled substance. The amount of fentanyl purchased was approximately one ounce. I know that the Mobile Detect test is a reliable method to test controlled substances and I

have repeatedly seen subsequent forensic reports confirming the results of such tests. I lodged the remainder at evidence at MCSO Property.

11. After the controlled buy was completed, I and other investigators surveilled the **Subject Vehicle** as it traveled to multiple locations within the District of Oregon. While surveilling the vehicle, I noticed that the **Target Number's** location was tracking with the **Subject Vehicle**'s location, which indicated the holder of the **Target Number** was likely one of the males inside the **Subject Vehicle** during the controlled buy. On August 6, 2026, in the early morning hours, I drove where the **Target Number**'s geolocation data indicated it would likely be located. There, I found the **Subject Vehicle** in the public parking lot of the Carrington Square Apartments located at 637 SE 182nd Ave, Gresham, Oregon 97233. I took a photograph of the **Subject Vehicle**.

12. On August 7, 2026, I applied for and was granted a search warrant authorizing me to install a tracking device on the **Subject Vehicle**. That warrant was authorized by the Honorable Jeffrey Armistead, United States Magistrate Judge. *See* 3:26-mc-00793. During the early morning hours of August 8, 2026, MCSO SIU investigators and I installed the tracking device on the **Subject Vehicle**.

**Second Distribution of Fentanyl by Defendants**

13. Within the last 14 days, I contacted the CRI and directed the CRI to contact "new Mario's" **Target Number** by call/text and request to purchase an amount of fentanyl. The CRI told me "new Mario" agreed to deliver fentanyl and they also agreed upon a specific place to meet to conduct the deal. The CRI showed me the messages with the "new Mario's" **Target**

**Number** confirming the conversation. Prior to the deal, I searched the CRI's person and CRI's vehicle for weapons, cash, and drugs. After determining the CRI was not in possession of these items, I then directed the CRI to go to the meeting location to purchase fentanyl with MCSO SIU investigative funds we had provided to the CRI. I also equipped the CRI with a real time audio video monitoring device which would allow investigators to monitor the transaction.

14. I surveilled the CRI to the pre-determined buy location, which was within Multnomah County, in the District of Oregon. Investigators and I maintained constant visual of the CRI enroute to and at the pre-determined buy location. The CRI did not stop, pick up anything or anyone enroute or at the buy location. After a short time two males drove up to the buy location in the **Subject Vehicle**. The males parked the **Subject Vehicle** next to the CRI in the roadway. I watched the CRI enter the rear passenger door of the **Subject Vehicle**. I listened to the CRI who asked to confirm the price of fentanyl with the males. I heard the male(s) state the price. I then watched the CRI exit the vehicle moments later. The males occupying the **Subject Vehicle** then drove away from the location. Through surveillance, although we still did not yet know their names, based upon on our subsequent arrests of both people we now know that **DAYAN JACIEL MENCIA-ARCHAGA** was once again the driver and **RONALD FABRICIO OCHOA-HERNANDEZ** was once again the passenger in the **Subject Vehicle**.

15. After the controlled buy, I surveilled the CRI to our subsequent meeting location. The CRI did not stop, pick up anyone or anything enroute to the meet location. At the meeting location the CRI handed me an amount of fentanyl. At that time, the CRI's person was searched for weapons, cash, and other drugs, with none being found. During a debrief, the CRI

told me they gave the male occupying the front passenger seat the MCSO SIU investigative funds I provided, then received the fentanyl from that same individual in return. The CRI again provided a physical description of the driver and passenger. The CRI advised the driver and passenger of the **Subject Vehicle** were the same males that they'd seen during the previous buy from the **Subject Vehicle**. The CRI's statements matched the physical description MCSO SIU investigators observed during the controlled buy.

16. I later transported the fentanyl to the SIU office. I weighed and tested an amount of the fentanyl with a Mobile Detect test and saw the test indicated positive for fentanyl, a Schedule II controlled substance. The purchased fentanyl weighed approximately one-half of an ounce. I lodged the remainder at evidence at MCSO Property.

17. By reviewing all the geolocation data and tracker data that were authorized by search warrants, I established that "new Mario" was spending numerous hours at the Carrington Square Apartment Complex. Prior to a previous controlled buy, MCSO investigators conducted surveillance at the Carrington Square Apartment Complex. By reviewing the geolocation and tracker data, I learned that "new Mario" confirmed he would be able to deliver fentanyl to the CRI while the **Target Number**, being used by "new Mario," was located within the Carrington Square Apartments. After the CRI reached out to order fentanyl from "new Mario" on the last occasion, MCSO SIU investigators then observed two (2) Hispanic males walking from the Carrington Square Apartments into the Southern parking lot of the complex. MCSO SIU investigators watched those males enter the **Subject Vehicle** and drive away. Approximately one (1) hour later, MCSO SIU investigators observed those same males arrive at the controlled buy

location in the **Subject Vehicle**. Based on all the above facts, I determined that the suspects, one of which goes by the moniker "Mario" and introduced himself to the CRI as the "new Mario," were residing inside an apartment at the Carrington Square Apartments.

18. On August 17, 2026, I observed that the **Subject Vehicle** and the **Target Number** were in the area of Walmart, located at 23500 NE Sandy Blvd, Wood Village, Oregon 97060. I drove to Walmart and saw the below depicted male access the **Subject Vehicle**. It should be mentioned that the below depicted male was the only person I observed inside the vehicle, which indicated that the male is the person identified as the "new Mario" based on the geolocation data of the **Target Number** and the location of the **Subject Vehicle** being in the same place. "New Mario" was subsequently determined to be **DAYAN JACIEL MENCIA-ARCHAGA**



**Third Distribution of Fentanyl by Defendants and the Fentanyl Poisoning Investigation of the Victim Child**

19. On August 21, 2026, I was informed by investigators of the Westside Interagency Narcotics (WIN) team that they were investigating the holder of the **Target Number** (the "new Mario") for crimes relating to an apparent drug poisoning of a one-year-old child (hereinafter "**Victim**"). In summary, from talking with the investigators involved, I've learned that in the late evening hours of August 20, 2026, in Washington County, Oregon both medical personnel and law enforcement responded to a residence after a one-year-old child suffered what was described as an apparent fentanyl poisoning, which was believed to have resulted when the child somehow consumed fentanyl that the child's parents had previously purchased.

20. In the late evening hours of August 20, 2026, medical personnel were called and responded to the **Victim Father's** residence where the **Victim** was found unresponsive. Based upon the circumstances medical personnel suspected the child had consumed fentanyl and they began administering Narcan (an opioid antagonist) and performing life-saving measures. The **Victim,** who was unresponsive, was taken to OHSU in critical condition for emergency life-saving medical care. As of August 22, 2026, the **Victim** is alive and still in the hospital. Medical staff reported that the **Victim** had fentanyl, amphetamines, and benzodiazepines in their system. I know that all of these substances can be extremely dangerous for infants. I also know that illicit fentanyl is particularly dangerous for infants because fentanyl is a powerful synthetic opioid that is up to 100 times stronger than morphine and more than 50 times stronger than heroin and that even tiny, microscopic amounts can cause a fatal poisoning/overdose, severe respiratory failure,

and substantial risk of death in very young children.[1] The investigation of the **Victim's** fentanyl poisoning/overdose is ongoing and we are in the process of obtaining relevant medical records and conducting follow up interviews of medical personnel. Local detectives in Washington County are also involved.

21. Based upon telephone records and an interview of **Victim's Father**, after he was advised of his constitutional *Miranda* rights, the **Victim's Father** said he contacted the **Target Number** (which we know to be used by "new Mario") to purchase both an ounce of fentanyl, as well as an additional eighth of an ounce of fentanyl (also known as a "ball" or "eight-ball" which is approximately 3.5 grams) within the last 3 days. The purchases were made at the same time. **Victim's Father** stated he was purchasing the ounce of fentanyl for another person, a friend, who distributes fentanyl and that the eighth of an ounce of fentanyl was what he was going to keep as payment for obtaining the fentanyl for his friend. The money for the deal was supplied by his friend. I learned the **Victim's Father** used cellphone number 971-xxx-6522 to contact the **Target Number**, which we know is being used by the person known to us as the "new Mario," to purchase fentanyl.

---

[1] 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) provide that if a person knowingly or intentionally manufactures, distributes, dispenses, or possesses with intent to manufacture, distribute, or dispense a Schedule I or II controlled substance and "death or serious bodily injury results from the use of such substance [the defendant] shall be sentenced to a term of imprisonment of not less than twenty years or more than life." "Serious Bodily Injury" is defined as bodily injury that involves: "(A) a substantial risk of death; (B) protracted and obvious disfigurement; or (C) protracted loss or impairment of the function of a bodily member, organ, or mental facility." 21 U.S.C. § 802(25).

22. According to **Victim's Father**, he purchased the fentanyl by calling the holder of **Target Number** and ordering fentanyl, which the user of the phone agreed to supply. The deal occurred in the area of SE 32nd Avenue and SE Market Street, in Portland, Oregon. **Victim's Father** reported that he purchased the fentanyl from a Hispanic male and after buying the fentanyl, he kept about three grams of fentanyl as his payment for doing the deal. **Victim's Father** said he then gave the ounce of fentanyl to his friend, who was buying it for purposes of further distribution. The **Victim's Father** and **Victim's Mother** both used some of the fentanyl. Drug paraphernalia associated with the use of fentanyl was found in the residence. **Victim's Mother** stated that the person using the **Target Number** was their source of fentanyl.

23. I reviewed geolocation and pen-register device information for the **Target Number**, and I reviewed tracker data for the **Subject Vehicle**. I learned that the **Victim's Father** contacted the **Target Number** on August 18, 2026, at approximately 6:46 PM hours. I saw that the **Target Number** contacted the **Victim's Father's** phone two different times around 7:30 PM. I saw the last time the **Victim's Father's** cellphone contacted "new Mario's" **Target Number** was at approximately 7:53 PM on August 18, 2026. Based on my observations in the geolocation data of the **Target Number** and the tracker data of the **Subject Vehicle**, the **Target Number** had left Carrington Square Apartments separately prior to the **Subject Vehicle** later leaving and that the **Subject Vehicle** left the Carrington Square Apartments on August 18, 2026 at approximately 7:52 PM. This leads me to believe that the user of the **Target Number** left and that another person then took the **Subject Vehicle** to deliver fentanyl to the **Victim's Father.** The geolocation data showed that the **Subject Vehicle** arrived in the area of the buy location with

**Victim's Father** at approximately 8:35 PM on August 18, 2026, and remained parked for about 29 minutes. That night both the **Target Number** and the **Subject Vehicle** traveled back to the area of the Carrington Square Apartments, just at different times.

24. On August 21, 2026, members of MCSO SIU began conducting surveillance at the Carrington Square Apartments. While conducting surveillance, MCSO SIU observed the heavier set Hispanic male (later identified as **RONALD FABRICIO OCHOA-HERNANDEZ**), who was observed as the passenger in the **Subject Vehicle** during the previous controlled buys, accessing 637 SE 182nd Avenue, Building E, Apartment xxx, Gresham, Oregon 97233, hereinafter **Premises 1**. The heavy set Hispanic male (**RONALD FABRICIO OCHOA-HERNANDEZ**) was wearing a Jordan shirt. MCSO SIU investigators then watched **RONALD FABRICIO OCHOA-HERNANDEZ** leave **Premises 1** and get into the **Subject Vehicle** and drive away from **Premises 1**.

25. During prior surveillance MCSO SIU investigators have seen both **RONALD FABRICIO OCHOA-HERNANDEZ** and **DAYAN JACIEL MENCIA-ARCHAGA** leaving the Carrington Square Apartments together and getting into the **Subject Vehicle** together. These are the two individuals that investigators observed conducting the controlled drug buys with the CRI. Based on all the above facts, I believe both **RONALD FABRICIO OCHOA-HERNANDEZ** and **DAYAN JACIEL MENCIA-ARCHAGA** resided at **Premises 1**.

26. During surveillance on August 21, 2026, after **RONALD FABRICIO OCHOA-HERNANDEZ** left **Premises 1** and drove away in the **Subject Vehicle**, investigators observed that the signal from the tracker that had been attached to the **Subject Vehicle** indicated that it

was traveling north towards the Columbia River. Shortly thereafter, the tracking device signals indicated that it was now in the Columbia River. **RONALD FABRICIO OCHOA-HERNANDEZ** was then observed returning to the Carrington Square Apartments, this time he was observed driving a Ford Taurus, while the tracking device indicated the device was still in the Columbia River. Investigators believe that the tracking device was discovered, detached, and thrown into the river.

27. **RONALD FABRICIO OCHOA-HERNANDEZ** was then observed going into **Premises 1** and a short time later he then left **Premises 1** and went back to the Ford Taurus, which was parked outside **Premises 1**. Shortly thereafter investigators observed **DAYAN JACIEL MENCIA-ARCHAGA** standing outside **Premises 1** and he had a heavy backpack. **DAYAN JACIEL MENCIA-ARCHAGA** then went down and also got into the Ford Taurus with **RONALD FABRICIO OCHOA-HERNANDEZ** and they both drove away and ended up at a residence at xxxxx NE Multnomah Street, Portland, OR 97230, hereinafter **Premises 2**. At **Premises 2**, both males walked inside the garage of the residence and they were seen carrying a backpack and a heavy duffle bag. A short time later they both left the residence and when they left, they no longer had either the backpack or duffle bag. They both drove away in the Ford Taurus. Both **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ** were subsequently stopped and arrested by investigators.

28. The male I described seeing at the Walmart in Wood Village, Oregon, as depicted in the photograph above, was identified as **DAYAN JACIEL MENCIA-ARCHAGA**. **DAYAN JACIEL MENCIA-ARCHAGA** was also identified as the driver of the **Subject Vehicle** during

the controlled buys and believed to be the "new Mario." The heavier set Hispanic male, who was identified as the passenger during the controlled buys, was identified as **RONALD FABRICIO OCHOA-HERNANDEZ.**

29. After arresting the **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ**, investigators received consent to search the garage at **Premises 2** from the family that resides at **Premises 2.** Inside the garage investigators located the duffle bag and backpack, which investigators saw being carried into the garage by **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ**. The duffle bag and backpack contained clothing, a passport, and a bag containing what appeared to be drug residue and the items appeared to investigators to be what is commonly known as a "go bag," which is a pre-packed bag designed to be taken when someone needs to quickly leave for a period of time.

30. On August 21, 2026, I applied for and was granted search warrant's authorizing the search of the **Subject Vehicle** and **Premises 1.** That warrant was authorized by the Honorable Jolie A. Russo, United States Magistrate Judge.

31. Investigators subsequently conducted a search of the **Subject Vehicle** and **Premises 1**. Inside the **Subject Vehicle**, investigators discovered an empty Motorola cellphone box. Investigators observed that the **Target Number** was written on that empty box.

32. Inside **Premises 1**, investigators located drug packaging materials and wrapping for kilogram-sized amounts of illegal narcotics.

33. After looking at photographs, **Victim's Father** subsequently identified **RONALD FABRICIO OCHOA-HERNANDEZ** as the person be bought fentanyl from on August 18, 2026.

34. Investigators transported **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ** to the DEA headquarters in Portland, Oregon to be interviewed. I responded to the location and assisted with interviewing both subjects. Prior to the interviews, both **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ** were advised of their constitutional *Miranda* Rights in Spanish, by a Spanish speaking investigator, and both confirmed they understood their rights. The Spanish speaking officer then translated the subsequent conversations.

35. **RONALD FABRICIO OCHOA-HERNANDEZ** was interviewed and told us that he'd been in Portland, Oregon for approximately five (5) months. **RONALD FABRICIO OCHOA-HERNANDEZ** told us that he sold fentanyl and that he had been selling between approximately one (1) and one-and-a-half (1.5) ounces of fentanyl, every 3 days, for the previous six (6) weeks. **RONALD FABRICIO OCHOA-HERNANDEZ** also stated that he sold one-and-a-half (1.5) ounces of fentanyl during any given day, approximately three (3) days per week. **RONALD FABRICIO OCHOA-HERNANDEZ** stated that he didn't know who the **Target Number** belonged to and that he hadn't had any contact with the **Target Number**.

36. Investigators showed **RONALD FABRICIO OCHOA-HERNANDEZ** a picture of the **Victim's Father**. **RONALD FABRICIO OCHOA-HERNANDEZ** stated that he'd sold the **Victim's Father** approximately three (3) grams of fentanyl for $150.00, every 4 days.

**RONALD FABRICIO OCHOA-HERNANDEZ** stated that he'd last seen the **Victim's Father** sometime on the day of August 18, 2026, which correlated with the timeline discovered during the poisoning/overdose investigation. **RONALD FABRICIO OCHOA-HERNANDEZ** was asked if he knew that people could die from using fentanyl, to which he replied, "Yes."

37. While speaking with **DAYAN JACIEL MENCIA-ARCHAGA**, he stated that he's been selling approximately three (3) grams of fentanyl per day for approximately the previous month. **DAYAN JACIEL MENCIA-ARCHAGA** stated that on some occasions he would sell around one (1) ounce of fentanyl. **DAYAN JACIEL MENCIA-ARCHAGA** stated that he's only been in Portland, Oregon for approximately four (4) to five (5) weeks. When investigators showed **DAYAN JACIEL MENCIA-ARCHAGA** a photograph of the **Victim's Father**, he confirmed that he'd seen the **Victim's Father** on two prior occasions. **DAYAN JACIEL MENCIA-ARCHAGA** denied any involvement or possession of the **Target Number**. However, as mentioned above I'd seen **DAYAN JACIEL MENCIA-ARCHAGA** at Walmart in Wood Village, Oregon, and I believed he was in possession of the **Target Number** based on the geolocation data we were receiving at the time. Additionally, on August 21, 2026, investigators observed the empty phone box with the **Target Number** written on it during a search of the **Subject Vehicle**.

38. While speaking with **DAYAN JACIEL MENCIA-ARCHAGA**, he mentioned that he possessed a fake identity card with the name of Jonathan. After looking through **DAYAN JACIEL MENCIA-ARCHAGA**'s personal belongings seized from his possession during the arrest, I located the fake identity card. The name on that fake identity card was "Jonatan

Alexander Hernandez Alvarez." After speaking with **DAYAN JACIEL MENCIA-ARCHAGA**, I reviewed information pertaining to the **Target Number** that was authorized by the geolocation warrant and learned that the **Target Number** was registered to the name "Jonatan Hernandez," which further supported my belief that **DAYAN JACIEL MENCIA-ARCHAGA** was the "new Mario," that he'd coordinated the delivery of fentanyl during the above-mentioned controlled buys, and that he'd organized the delivery of fentanyl that is linked to the poisoning/overdose of the one-year-old **Victim**.

39. Based on the foregoing, I have probable cause to believe, and I do believe, that **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ** have committed the Target Offenses. I therefore request that the Court issue a criminal complaint and arrest warrant for **DAYAN JACIEL MENCIA-ARCHAGA** and **RONALD FABRICIO OCHOA-HERNANDEZ** for committing the Target Offenses.

///

///

///

40. Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Scott Kerin, and AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Kyle Beam, Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 1:12 ~~a.m.~~/p.m. on August 23, 2026.

Jolie A. Russo
HONORABLE JOLIE A. RUSSO
UNITED STATES MAGISTRATE JUDGE